# CHARLESTON.

FINDLEY *et al. v.* FINDLEY *et al.*

(DENT, JUDGE, not sitting.)

Submitted June 11, 1896—Decided Nov. 21, 1896.

1. JUDICIAL SALE—REALTY—PERSONALTY—INFANT OR INSANE PERSON.

A judicial sale of land, as a general rule, converts it into personalty. If land be sold, under chapters 79 or 83 of the Code of 1891, belonging to an infant or insane person, the sale does not at once convert into personalty, but the proceeds remain realty until the infant becomes of age, and, in the case of one insane, until he becomes capable of making a will, when they are to be regarded as personalty.

2. GUARDIAN AND WARD—SALE OF WARD'S LAND—GUARDIAN'S BOND.

Where a guardian gives bond, and, later, land of his ward is sold under decree, and he gives an additional bond to secure its proceeds, the latter bond is primarily liable for such proceeds.

3. BONDS IN JUDICIAL PROCEEDINGS—COLLATERAL ATTACK.

Bonds taken in judicial proceedings bind obligors if the court have jurisdiction, though its action be erroneous, but not void. The action of the court can not be incidentally questioned by impeaching the bonds.

4. RECITALS IN BONDS—ESTOPPEL.

A bond reciting one to be guardian estops its obligors from questioning that fact.

5. BONDS IN JUDICIAL PROCEEDINGS—MISNOMER IN BONDS.

If a bond in a judicial proceeding bind one to account for money put in his hands by the court, as to which he is in law to be regarded a special receiver or custodian, the bond is good for such money, though it call the party a guardian.

6. EQUITY PRACTICE—COMMISSIONER'S REPORT—EXCEPTIONS.

Exceptions to a commissioner's report recommitted will not be considered in hearing the case on a second report, unless such exceptions be made to the second report.

J. HOP. WOODS for appellants:

I.—*The interest of Susan Findley in proceeds of sale was personalty and passed to her administrator, and not to plaintiffs as heirs.*—Code, c. 86, ss. 2, 3; Story's Eq. § 1212; 1 Lomax, Ex'rs c. 1, § 1, p. 220, sub. sec. 7, and p. 223, sub. sec. 8; Ib. c. 2, § 1, p. 229, sub. sec. 1; 1 Rand. 313.

II.—*Martin and Kunst if liable at all are only liable as additional sureties.*—16 W. Va. 167.

III.—*Only parties in interest can sue. Plaintiffs had no interest.*—87 Va. 655; 18 W. Va. 693, syl. 3; 6 Gratt. 301; 9 Gratt. 273.

IV.—*Courts will not enlarge liability of sureties by implication.*—3 Call, 74; 2 Rob. (old) Prac. p. 132.

V.—*Plaintiffs could not reply to supplemental answers and at same time proceed to decree. Respondents were entitled to time within which to prove answers.*—Minor's Inst. Vol. 4, part 1, p. 674; 3 W. Va. 480, syl. 1.

F. M. REYNOLDS for appellees:

I.—*The general bond of a guardian is not liable for money derived from the sale of ward's realty where special bond is given when said money is placed in guardian's hands.*—38 Me. 47; 11 Met. (Mass.) 529; 90 Pa. St. 350; 11 Cush. (Mass.) 22; 51 Iowa, 152; 23 Ind. 607; 47 Ind. 310; 39 N. J. Eq. 27; 125 Pa. St. 542; 43 Mo. App. 16; 83 Me. 195; 4 Nev. 429; 13 Gray (Mass.) 387; 130 Mass. 439; 9 Am. & Eng. Enc. Law, 141.

II.—*The sureties on new bond become wholly responsible, and former sureties are released when new bond is given.*—23 Gratt. 525.

III.—*Liabilities on general and special bonds distinguished.*—45 Pa. St. 408; 42 W. Va. 178.

W. R. D. DENT for appellees, cited Code, c. 71, s. 19; Code, c. 83, s. 7; 32 W. Va. 14; 36 W. Va. 112.

BRANNON, JUDGE:

William Findley devised a tract of land by the language "To my beloved wife, Susan Findley, and my four children of her body, * * * provided that, if my wife should intermarry with any person after my death, said home farm

shall thereupon go and descend to said four children"—naming them. James W. Findley qualified as guardian of said four children, with Cornelius E. Reynolds as surety in his bonds. This guardian brought a suit to sell the coal under the land, and, under a decree in the case, it was sold. Another decree, after reciting that, it appearing that by the will of William Findley said land was devised to his wife and the four children, provided that, if his wife should marry, it should go and descend to said four children, and that she still remained unmarried, sets apart one thousand two hundred and ninety four dollars, being one fifth of the proceeds of sale, "for the use of Susan Findley while she remains a widow and unmarried, which shall be loaned out upon good and ample security, and the interest paid to Susan Findley annually;" and this decree then provided that all the proceeds of sale should be paid "to James W. Findley, guardian," and directed him to manage said fund for the interest of his said wards as required, "provided that he shall pay the interest on said sum of one thousand two hundred and ninety four dollars to Susan Findley as the same may accrue from year to year." The decree reserved "right to make further orders herein from time to time as to the management of said fund." This decree required said guardian to give a bond before receiving money under it, and he gave such bond, with Martin and Kunst as sureties. The guardian paid the children, when of age, all the money, except said one thousand two hundred and ninety four dollars set apart for the widow, and on her consent he paid one fourth of that to one of the children. The widow never married, and died in 1887. Afterwards three of the children brought the present chancery suit against said guardian and the sureties in his first bonds as guardian and the said second or additional bond given under the decree; and this suit resulted in. a decree charging said money on the said guardian and Martin and Kunst, sureties in the second or additional bond given under said decree, and exempting the sureties in first guardian bonds. Kunst and Martin's executrix appeal.

The personal representative of Susan Findley was not a party to the suit until he was made such by an amended

bill, but was never served with process, and the decree complained of was rendered when he was thus absent from the cause. Later a motion was made in vacation to reverse this decree because of want of service of process on Susan Findley's administrator, or appearance by him, when said administrator appeared and tendered his answer, admitting that he had full notice of all the proceedings and decrees in the case, waiving all objection to any error therein against him, and agreeing to any amendments of the record necessary to render the decrees binding on him as if he had appeared and filed an answer; admitting all the allegations of the original and amended bills. He had been served with a notice of the execution of an order of reference by a commissioner.

Appellants object to the decree because Susan Findley's administrator was not before the court when it was made. Was he a necessary party? This leads us to inquire whether this fund is to be deemed as belonging to her estate at all, and, if belonging to her estate whether it was realty or personalty; for, if realty, her administrator had no title to it, and was not a necessary party, but it descended as realty on her death to her children. It seems plain that the will vested the mother and her four children with a joint estate; theirs being in fee simple, hers in fee simple defeasible upon condition subsequent—the event of her marriage, if that condition be not void as against public policy, because in restraint of marriage, a matter not now material. Being real estate, what is the effect of the decree to sell Mrs. Findley's interest along with the interest of the others? Did it work a conversion from real into personal estate, so as to vest title to the money in the administrator? Or did it yet remain in reality, descending on her death to her heirs? This is not a question of ordinary equitable conversion, as where a will directs land to be sold, or money to be invested in land, in which cases a court of equity raises the fiction, to execute the intention, that at once, before sale, the land is held to be money, in the case of land directed to be sold, and, in the other case, that the money is, before actual investment, to be regarded as realty. *Harcum's Adm'r* v. *Hudnall,* 14 Gratt. 369. Nor is it the case of the surplus

proceeds of a decedent's land, after payments of his debts, sold under decree of court, which surplus seems to be realty, and, therefore, no conversion from realty to personalty as to his heirs and personal representatives. *Fowler* v. *Lewis' Adm'r* 36 W. Va. 113, point 15 (14 S. E. 447). Late English cases seem to change there the doctrine of earlier cases, and make such sale work a total conversion so that the surplus is personalty. See *Hyett* v. *Mekin*, 25 Ch. Div. 735, reviewing cases, and holding that "an absolute order of sale, made within the jurisdiction of the court in an administration suit, operates as a conversion from the date of the order and before sale." Beach, Mod. Eq. Jur. § 532, notes this change in the English courts, and puts their holding as the true doctrine.

This rule of conversion or non-conversion is one raised for the purpose of devolution of property—to settle, as between personal and real representatives, which shall take; and we must be careful to apply it according to the question before us. Now, when a dead man's land is sold under mortgage, trust deed, judgment lien, or general creditors' suit, any surplus would go to that man's heirs or devisees—not personal representatives. So far it continues realty. But that surplus, as a part of the estate of the heir or devisees, is personalty. If he dies, it goes to his personal representative, because the decree passed title to land away from him, and vested right to the money in him. The decree converted land into money by its mere force. As to this the fact that the heir's title is by descent makes no difference from what it would be if he had acquired by deed. It is his land that is sold, and as to him it becomes personalty. If he had sold by his own act, the purchase money would be personalty—a complete conversion. 2 Story, Eq. Jur. §§ 790, 1212. What difference does it make when it is sold through a court? From the generality of the language of the books, this matter might be misunderstood. And this case is not the case of a sale under a mortgage or deed of trust, where the surplus, after payment of the debt, is personalty if the sale be in the lifetime of the mortgagor, and realty if after his death. 1 Lomax, Ex'rs, 225; 2 Jones, Mortg. §§ 1695, 1931; *Fowler* v. *Lewis'*

*Adm'r,* 36 W. Va. 151 (14 S. E. 447). But the present is the case of land sold, in lieu of partition, under statute, viewing it as her land; in any view, sold under a decree. I think that such sale, as to adults, works an absolute conversion from realty to personalty, but not as to infants and not as to insane persons. The statute, as to them, in section 11, chapter 83, Code 1891, provides that money arising from sales in partition and under the chapter for sales of land of persons under disability shall, on their death, go as if it had not been sold. By making this distinction, the lawmakers seem to intend a conversion in other cases. If not, if the general.law would still consider the money as land, it would apply to infants, insane persons, and sane adults alike, and there would be no need of such a section. Why should not this construction prevail? This whole doctrine of equitable conversion, by which what is in fact land is treated as personalty, or money as realty is merely a fiction of courts of equity, to give impress to property to carry out the intent of wills. This reason does not apply to a sale in lieu of partition, where the very purpose is to change it into money, so it may be divided. 3 Pom. Eq. Jur. § 1167, says that, when land is sold by a court, it is the doctrine of the court that its character should be changed "only so far as may be necessary to accomplish the particular purpose." Then, what is the purpose in partition sales? A total division of dollars. You can not accomplish the purpose otherwise than by dividing the dollars. That is the very end to be accomplished—not like a sale of a decedent's land, where there is a surplus. *Vaughan* v. *Jones,* 23 Gratt. 444, must not be regarded *contra,* as that was the sale of lands of an infant. There is no conversion as to infants until of age, or as to insane persons until they become sane; afterwards, in both cases, I think there is. *Turner* v. *Dawson,* 80 Va. seems *contra.* I know law can be found to the contrary (17 Am. & Eng. Enc. Law, 803) but it was not based on a statute like ours. And there is law elsewhere to sustain the view here presented, there cited. In *Wallace* v. *Greenwood,* 16 Ch. Div. 362, the master of the rolls said, "Where the court has power to sell an infant's estate, the order of sale operates a conversion, and the estate becomes

personalty." Approved in *Hyett* v. *Mekin*, 25 Ch. Div. 742. It is settled in England, after reconsideration, unless changed by statute. Beach, Mod. Eq. Jur. § 532. So I hold that where land is sold under decree or judgment, belonging to any one, whether he acquired title by purchase or descent, the sale completely converts it into personalty as to that owner. If the land be that of an infant or insane person, and sold under chapters 79 and 83 of the Code, by reason of section 11, chapter 83, there is no immediate conversion into personalty; but in the infant's case the proceeds continue land until his death before majority, or till majority, and in the case of an insane person until he becomes capable of making a will, and in such cases the money would, on his death, go as the land would have gone, if never sold. These are exceptions from the general rule. When such infant attains majority, or the insane person becomes sane, the character of realty ceases, it seems to me.

It is argued that Mrs. Findley's administrator is not a necessary party (1) because the will itself gave her only a life estate, a position which I have answered in saying she had a fee simple defeasible on condition subsequent, which never took place; and (2) because the effect of the adjudication in the first suit was to limit her to a life estate, and the adjudication limits her to that as *res judicata*. We do not know just what the character of suit was, nor what the bill charged as to her estate. The only decree in it before us does not so limit her by adjudication, but rather the reverse; saying the land had been devised to the widow and children, with proviso that, if she married, her interest should go to the children, and set apart a part for the use of the widow while single, this being done because it could not be given to her at once, as she might marry. This is no explicit adjudication to limit her to a life estate. It ought to be plain to work that result. So Mrs. Findley's personal representative would be a necessary party, and decree without him was error; but the paper called an "answer" obviates its effect. The appellants had right to complain of this error, because taking a decree against them without the presence of the

administrator would not bind the administrator, and he could sue them, and make them pay over again; but the administrator estops himself by that act.  It is said this error could not be waived by the administrator, and the paper could not have the effect to do away with the error.  I have queried as to in what light this paper should be viewed.  It is not a release of error, because, the administrator not being before the court, no error exists against him to be released, but the error was against the appellants.  It is not an answer, because the case had ended.  It could not be considered an answer to the motion to reverse, founded only on error of law.  What is it?  It is a release of any demand of recovery by the administrator, an agreement not to hold them responsible, a release of action, and an agreement that the decree may be held an estoppel against him as if a party.  He says he had no notice of the suit.  He was a party, but not served with original process; but he waives such service.  The decree is binding on him, not as *res judicata*, perhaps, but as a contractual estoppel, and by conduct *in pais* evidenced by record.  Unless we deny altogether his capacity to do the act, it is a protection against a demand by him.  The money would go out of his hands to these distributees, in the absence of debts, and no suggestion of any is made.  The distributees entitled to the money have a decree for it.  This error is discovered.  Then the administrator, seeing presumably, there are no debts, and that the decree puts the money just where he would put it, consents in solemn form, on a motion to reverse the decree for such error, that it may go there, and that he will discharge the debtors from his demand.  Here is a valid consideration, in the prejudice that might result to the debtors and the favor to the administrator and distributees through him, giving the so called "answer" a valuable consideration as a contract.  A contract it is, a release of cause of action.  And, as the distributees got the money under a decree they themselves asked, their hands are tied against any steps against the administrator for doing the act, because they got the money under the decree, and because they make use of this paper.  And if he had been served with process, and the administrator had consented, could

not the fund have been decreed to the distributees at once, without going to his hands, they being the parties ultimately entitled? He has ratified such a decree, and as a ratification it relates back to and validates the act as if at first authorized. The amended bill charged that there were no debts, which was not denied; and a decree giving the money straight to the children of Mrs. Findley would not have been improper, they being entitled to it in the absence of debts, if the administrator had been served with processs. He has waived that. Such a decree could have been entered without his consent, had he been served, and it would have protected the appellants. He has waived service, and agreed that the proceedings shall be given the same force as if he had been served. Again, could he not have given a valid consent to such a decree, if in court? He later consented.

The next question is, is there any liability under either bond? It is said not, because the fifth interest is the proceeds of land of Mrs. Findley, and could not be sold, as the suit was only to sell infants' land. In dealing with this question, in addition to its inherent difficulty, we can not tell just what are the facts. What was the exact character of the suit in which the land was sold? Its pleadings and decrees are not in the record, save the decree of confirmation of sale. If a suit having the double aspect of a suit by a guardian to sell lands of infants and also one in partition, making, as it did, Mrs. Findley a party as a joint owner, alleging impracticability of partition in kind, it would have been proper to sell her fifth along with the others. Or, if a mere guardian's suit to sell land, and she consented, it would have been proper to sell her interest with the others. If purely a guardian's suit, and the bill alleged she had only a life estate, a decree so adjudicating would bind her, as *res judicata*, to a mere life estate interest. In the last case she would now have no interest. It would all be money of the infants. This feature, to take away her fee interest, does not appear. We must presume that such a case was presented as rendered a sale of Mrs. Findley's interest proper, as we never presume error in a court of general jurisdiction. At any rate, she would be bound by the decree as a finality,

conclusive upon the property, on its sale; and others would not be heard to question it. Here is a fund arising from a judicial sale by a court of general jurisdiction, with Mrs. Findley and her property before it, and the fund goes into the hands of a person who gives bond, with sureties, reciting that, in a certain suit of James W. Findley, guardian of certain children, against them and Susan Findley, widow, coal in the lands of said "heirs and widow" had been sold, and the money ordered to be paid to "James W. Findley, as such guardian, for the benefit of said heirs and widow, and to be properly managed for said heirs and widow, and paid to them when entitled to receive it," and providing for a faithful discharge of his duties as to said money, with the covenant "that he shall pay the same to said heirs and widow when they shall be entitled to receive it." Now, is it possible that the law will let the obligors in that bond say that they are not bound because the decree is erroneous in selling land of Mrs. Findley not liable to be sold? The court having jurisdiction, acts done and bonds taken under it bind the obligors. *Gibson* v. *Beckham,* 16 Gratt. 321. Until reversed, the decree stands good, though it were erroneous, and can not be questioned by the surety in the bond. *Franklin's Adm'r* v. *Depriest,* 13 Gratt. 257. The covenant of this bond was to account for and pay all this money for the benefit of children and widow, and the bond recited just what money, and whence it emanated; and the obligors are bound to pay Mrs. Findley's share to her, or those to whom it is lawfully decreed to go, and this by the very force of the letter of the covenant. Again, the bond recited Findley to be guardian, and that the money was to go to him as such; and the obligors are estopped from either saying he was not guardian, or was not receiving the money in that character. *Monteith* v. *Com.* 15 Gratt. 172. Also, the bond recited that it was money paid to Findley for the benefit of "said heirs and widow." That is broad enough to cover her share in any aspect, whether Findley was, as to that, guardian or not. That share went into the hands of Findley as her money, as the bond says, and the obligors can not say it is not hers for want of authority to sell her land. They recognized the authority of the court

as to this. It is true, "sureties are favored in equity, and the court will never extend relief against them. By their contract they are bound by law." *Croughton* v. *Duval*, 3 Call, 74. But here the bond itself binds them to all they are asked to do. Equity will not relieve them of a plain obligation within the letter and spirit of their bond. Suppose Findley was not guardian as to Mrs. Findley's money? What is there in the mere name? As to her say he was a special receiver, as I think he was, though not called such. The proceedings made him such. The bond covers the case of receiver. It specifies what money, and where it came from; and in whatever light, as to this money, we view Findley, this bond binds its bondmen to account for it. It was put into his hands by order of court.

The next question is, shall the bonds given by the guardian, on qualifying as such before sale, bear the burden exclusively, or shall that given under the decree bear it exclusively, or shall all bear it together? As we hold the money in question to be money belonging to Mrs. Findley, the bond given under the decree should bear it; and so the circuit court did in its decree. But if it were money of the infants, I think the second bond must bear the burden primarily. *Reed* v. *Hedges*, 16 W. Va. 167, does not decide this question. It holds the first bonds as liable for money arising from sales of infants' land, but does not say whether that liability is second, or primary, or in common with the second bond. It is going far to say that a guardian's bond, given before any such sale, when the guardian has only the personalty and rents of realty in his keeping, shall be stretched to cover the whole proceeds of a sale of real estate, on the mere theory that, when executed, its makers might have contemplated the contingency of such land sale in the future; but so it is decided in that case. But, as the statutes provides for a special bond as to money arising from land sales, that ought to bear, primarily at least, the liability as to that money, because the second bond is given with special reference to that money, and none other. For support of this view I refer to *Board* v. *Rader*, 42 W. Va. 178 (24 S. E. 680) holding that a bond given by a sheriff as to school money must alone bear lia-

bility for it, and that no liability for it falls on the general bond. In *State* v. *Starnes*, 5 Lea, 545, it is held that collector and sureties on general bond given for county and state revenue are not liable on bond given for school fund, because "it must be assumed the law did not intend to include in the general bond what was thus specially provided for." In *State* v. *Bateman*, 102 N. C. 52 (8 S. E. 882) and *State* v. *Bradshaw*, 10 Ired. 229, it was held that, if no provision is made for additional bond to cover new duty, a bond given after the law is in force, though the official bond provide only for faithful discharge of duties and accounting for money received by virtue of office, will be held liable; but, if the law *requires bond as to the new duties, the new bond alone is to stand for such duties. In *White* v. *East Saginaw*, 43 Mich. 567 (6 N. W. 86) the law is laid down that duties not yet existing, and not germane to and that are not within the contemplation of sureties on the official bond, are not covered by their obligation, and that the very fact that a new or special bond was required shows that the legislature regarded the new duty foreign to the office. Now, as to this the case we decide, it is true, that, when this guardian qualified, the law then existing provided that a guardian might file a bill to sell land; and it may be argued that his sureties are to be held, as contemplating liability contingently for such sale when signing the bond, and ought to be held for such sale; but the reply is that that law itself required, as to such sale, a special bond, and the sureties had right to assume that their covenant, however broad its language, not specifying such sale expressly, could not be thus inferentially made to apply to it. The duty of a guardian as to money from land sales is special under our law. The general rule is that, where an officer is required to perform a duty special in nature, and give a special bond for its performance, no liability therefor attaches to his general bondsmen, in the absence of any declaration that they shall also be liable. *Board of Sup'rs* v. *Ehlers*, 45 Wis. 281. These principles will be found ably discussed and sustained in *Morrow* v. *Wood*, 56 Ala. 1, and Throop, Pub. off. § 220. So, in *Board of Sup'rs* v. *Pabst*, 70 Wis. 352 (35 N. W. 337); *Broad* v. *City of Paris*, 66 Tex.

119 (18 S. W. 342); *Com.* v. *Toms*, 45 Pa. St. 408. Just here I meet with the case of *Henderson* v. *Coover*, 4 Nev. 429, holding that the general bond of a guardian is not liable for proceeds of sale of real estate, for the reason that the sale of real estate was not one of his general duties, and that the sureties on the special bond only are liable. The statute there requiring an order of court to sell is much like ours, and the case seems strongly in point. As to liability for new and old duties, see *Com.* v. *Holmes*, 25 Gratt. 771. Cases above intensify my doubt, above expressed, as to the point in *Reed* v. *Hedges*, 16 W. Va. 167, holding the general bond of a guardian liable for land money at all; but it is not necessary to review that. If liable, it is only secondarily so.

Another question raised is as to failure to allow commissions which the guardian had waived. There was an exception to the first report on this score, but none to the second, by these appellants. We can not consider the exception, as items or matters excepted to in a commissioner's report recommitted will not be open to investigation in acting on the second report, unless again excepted to. *Carskadon* v. *Minke* 26 W. Va. 729.

Another question raised is that a supplemental answer was filed, and no time given to take depositions and make defense under it. This point is not good (1) because no order files or recognizes this answer; (2) no continuance was asked. We reach the conclusion to affirm the decree.